People v Grant (2026 NY Slip Op 00910)

People v Grant

2026 NY Slip Op 00910

Decided on February 18, 2026

Appellate Division, Second Department

Wan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 18, 2026
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

CHERYL E. CHAMBERS, J.P.
DEBORAH A. DOWLING
LILLIAN WAN
ELENA GOLDBERG VELAZQUEZ, JJ.

2024-01866
 (Ind. No. 2631/19)

[*1]The People of the State of New York, appellant,
vCalvin Grant, respondent.

APPEAL by the People from an order of the Supreme Court (Vincent M. Del Giudice, J.), dated January 26, 2024, and entered in Kings County, which granted the defendant's motion to dismiss the indictment on the ground that there was an unreasonable delay in prosecution.

Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove, Solomon Neubort, and Jordan Cerruti of counsel), for appellant.
Patricia Pazner, New York, NY (Tammy E. Linn of counsel), for respondent.

WAN, J.

OPINION & ORDER
On April 11, 1992, at 4:40 a.m., Stacey Joyner was fatally shot on the rooftop of an apartment building in Brooklyn. On January 24, 2019, nearly 27 years later, the defendant was arrested and charged with murder in the second degree in connection with Joyner's death. The defendant moved to dismiss the indictment on the ground that there was an unreasonable delay in prosecution, arguing, among other things, that his due process right to a prompt prosecution had been violated. After a hearing, the Supreme Court granted the defendant's motion and dismissed the indictment.
The People appeal. For the reasons that follow, we hold that, under the circumstances presented here, the Supreme Court should have denied the defendant's motion.Factual & Procedural Background
In January 2023, the defendant moved to dismiss the indictment on the ground that there was an unreasonable delay in prosecution. He contended, among other things, that his due process right to a prompt prosecution had been violated. In an order dated May 17, 2023, the Supreme Court directed a hearing pursuant to People v Singer (44 NY2d 241), and held the defendant's motion in abeyance pending the hearing. In that order, the court stated that the "key issues sub judice are whether the periods of delay from April 1992 to 2004, and from 2004 until assignment of this case to, and action by, the Cold Case Unit in 2018 constituted unreasonable delay in commencing the instant prosecution or such delays were based upon good cause."
At the Singer hearing, the People called three witnesses: Detective Robert Dewhurst, Craig O'Connor, and Jeffrey Suckow. The following facts were established:
Dewhurst was a member of the Cold Case Squad of the New York City Police Department (hereinafter NYPD), which investigates unsolved homicides across New York City. Dewhurst testified that since 1992 to the time of the hearing, there were "[a]pproximately a little over 6000" cold case homicides in New York City, with approximately 12 to 14 NYPD cold case detectives working at the time of the hearing. Dewhurst had investigated on anywhere between 13 and 17 cold cases at a time.
In February 2018, Dewhurst reviewed the original case file and learned that Joyner's death was reported to the NYPD by Gregory Ellis, a security guard for the building who had since [*2]died. The police interviewed one of Ellis's fellow employees, who, according to the People, Dewhurst was able to reinterview after reopening the case in 2018. The employee related to the police that, on the morning of the murder, he was approached by an individual named Antoine Smith, who complained that the defendant had stolen Smith's firearm and was on the roof. The employee ascended to the rooftop in search of the defendant, but did not see him. Returning to the ground floor, the employee then heard a gunshot, and received a radio message that a shot had been fired. The employee returned to the roof, and this time found Joyner's body, clad in nothing but a pair of socks and with two gunshot wounds in the head.
Shortly thereafter, the police arrived to process the scene and interview witnesses. They found two 9 millimeter shell casings and a projectile. However, the police were unable to recover any latent fingerprints, surveillance footage, or a weapon.
The following day, detectives interviewed Smith regarding his encounter with the defendant. Smith claimed that, on the morning of the murder, he went to a party in the building. He handed over his firearm, a 9 millimeter pistol, to a disc jockey. Smith later retrieved the firearm and went to the rooftop. The defendant followed Smith. On the roof, Smith reached for the firearm, which became tangled in his pants. The defendant seized the firearm, pointed it at Smith, and pulled the trigger, but the firearm misfired. The defendant commanded Smith to leave the roof. Smith then lodged his complaint with the security guards. While Smith was downstairs, the defendant came down to the front steps of the building and pointed the firearm at Smith again.
Dewhurst explained that the police identified no witnesses who were present for Smith's argument with the defendant, though they did learn of an individual named Mikey or Mickey who was present for Smith's discussion with the security guards. Dewhurst related that there was a detective note from 1992 stating "find Mikey," though the original case file contained no other information about him.
Dewhurst testified that on April 21, 1992, the police interviewed the defendant, who "had a slightly different story about how he came to have [Smith's] firearm in his hands." The defendant explained that Smith was firing his weapon on the rooftop on the morning of the murder. The defendant walked over to Smith and asked to see the weapon, and once Smith handed it over, the defendant told him to leave the roof. The defendant reported that he then walked to Bristol Street, where he sold the firearm in exchange for drugs. Dewhurst explained that detectives deemed the defendant to be a person of interest. However, although witnesses placed the defendant in the general area on the day of the murder, none saw him on the roof with Joyner.
Dewhurst related other findings from the case file. Detectives spoke to three women—Doreen Williams, Ruth Williams, and Andrea Stewart—who reported that they heard an individual confess to the killing. This individual stated that he shot Joyner once, remarked "oh, you're not dead," and then shot her again. The women described the individual as a five-foot-six dark-skinned black man with a mustache, which did not match the defendant's description. The women did not provide the individual's name or contact information. Dewhurst was not aware if anyone followed up with the women or showed them photographs.
The case file also contained a document detailing the October 1992 arrest of one Jermaine Graves for possession of a 9 millimeter handgun. A note attached to that document contained a handwritten request to compare the ballistics from that handgun to the ballistics in Joyner's case. Dewhurst was unaware if detectives ever made that comparison, but stated that there was no indication that Graves was present at the building on the day of the murder.
Dewhurst stated that the Office of Chief Medical Examiner (hereinafter the OCME) had examined Joyner's body, taking fingernail scrapings, her underwear, and swabs of, inter alia, her mouth and vagina. The police were aware in 1992 that the OCME had detected semen on one of the swabs. Dewhurst acknowledged that the police did not request DNA testing of these items at that time. Nor did they seek a DNA sample from the defendant between 1992 and 2018, though he had been on parole on numerous instances during that time.
Dewhurst testified that the original case file indicated that the police requested media attention for this case "[b]ecause all their leads, they had no more leads, they had no witnesses up until that point; nobody was on the roof with [the defendant]." He also relayed that the original case file contained additional entries "as late as 1995" concerning the detectives' investigative efforts. Ultimately, Dewhurst explained that based upon the police investigation conducted in 1992, "[t]hey got as far as they did, and there was nobody else on the roof with the victim and the perpetrator of the crime." As a result, there were no leads that implicated the defendant, the only person of interest [*3]in the case.
Dewhurst reopened the case in 2018 after receiving a phone call from someone at the OCME indicating that the OCME possessed untested swabs related to Joyner's murder. He reviewed the case file, reinterviewed witnesses, and requested DNA testing on Joyner's oral swab. Other than the DNA test request, Dewhurst took no steps that the detectives had not taken in 1992. He tried to reinterview the women who had related the story about the individual who confessed to killing Joyner, but Ruth Williams and Doreen Williams had both died, and Andrea Stewart did not remember the conversation. After learning that the defendant's DNA profile was a match for the profile developed from the oral swab, Dewhurst reinterviewed him. The defendant repeated his narrative from 1992, and did not admit to killing Joyner, though he acknowledged knowing her brother. Dewhurst then arrested the defendant.
O'Connor, an OCME deputy director, testified as an expert in forensic DNA analysis, the statistical significance of DNA analysis, and the history of DNA testing. He explained that in April 1992, the same month as Joyner's murder, the OCME began performing DNA testing using the HLA-DQ Alpha method. An analyst could develop a DNA profile and then compare it to the profile of a known individual, typically through a blood sample. The OCME would only use the HLA-DQ Alpha method to create a profile from a sample if there was already a sample of a known individual, such as from a suspect, with which to compare it.
The OCME was not able to use saliva samples until 1996, which was the same year that it switched from the HLA-DQ Alpha method to the currently prevailing PCR-based short tandem repeat (hereinafter STR) method. Although, in the 1990s, the OCME was able to process saliva samples from suspects, O'Connor testified that the OCME "[wasn't] getting a lot of abandonment samples," in large part because the amount of DNA contained in many abandonment samples was insufficient, based on the testing available at that time, to form a DNA profile.
In 2000, the OCME joined the Combined DNA Index System (hereinafter CODIS), which allowed laboratories such as the OCME to upload and share samples and profiles at the local, state, and national level. Before the OCME joined CODIS in 2000, there was no DNA database analysts could use to upload and compare DNA profiles. Moreover, an HLA-DQ Alpha profile created in 1992 could not be uploaded to CODIS, since CODIS only supported profiles created using the STR method. O'Connor explained that the OCME did not have the resources to retest every previously submitted sample with new DNA testing methods, and that it relied on customers, such as the NYPD, to request retesting for specific cases.
With respect to the instant case, O'Connor testified that the OCME received evidence from Joyner's murder in April 1992. As noted above, an oral swab yielded the presence of semen. However, the OCME did not create a DNA profile from the oral swab because it did not have a blood sample of a known individual with which to compare it. If the police had provided a sample of the defendant's DNA, whether through his consent or a court order, the OCME was capable of making the comparison.
In March 2018, following a request to perform DNA testing on the oral swab, OCME analysts developed a DNA profile, which they labeled "Male Donor A." The OCME uploaded that profile to CODIS. Several days later, the Division of Criminal Justice Services notified the OCME that the profile was a match for that of a convicted offender: the defendant. The defendant's profile had been uploaded in 2004 as a result of an unrelated crime. In March 2019, the OCME received a DNA sample from the defendant. It built a profile from that sample, compared it to the profile developed from the oral swab, and again found a match.
Suckow, a supervisor in the NYPD's firearms analysis section, testified as an expert in the fields of firearm operability and the National Integrated Ballistics Information Network (hereinafter NIBIN). Suckow testified that the NIBIN system allowed the police to compare images of firearm cartridge casings recovered from crime scenes and examine whether there are matches between unique characteristics. Officers first upload images of cartridge casings to the Integrated Ballistics Identification System (hereinafter IBIS), which contains image-capturing hardware; the images are then uploaded to NIBIN. Suckow explained that the NYPD started using IBIS in 1997, and later joined NIBIN in the early 2000s. The NYPD prospectively uploaded images beginning in 1997, and retroactively uploaded images from cases arising between 1995 and 1997. Approximately 100 to 200 images were uploaded from older cases dating back to 1977. Suckow acknowledged that the NYPD is capable of manually comparing cartridge casings and a firearm with the use of microscopy.
In 1992, the police performed a ballistics examination of the cartridge casings recovered from the crime scene, determining that they had been fired from the same firearm. Suckow stated that the casings were never compared with an actual firearm. He examined NYPD records to see if anything related to Joyner's murder or the arrest of Jermaine Graves had ever been uploaded to NIBIN, but Suckow found nothing.Order Appealed From
In an order dated January 26, 2024, the Supreme Court determined that "the police exhausted all available leads in 1992," and, therefore, "the period from 1992 to 2004 cannot be considered a period of delay." However, the court also determined that "the proffered reasons why the defendant's DNA was not tested prior to 2018, a veritable logistical impossibility due to a lack of resources at the N.Y.P.D. and the O.C.M.E., is not a legally cognizable excuse or exception resulting in the temporal exclusion of additional time beyond 2004." The court further determined that "[a]lthough logistical constraints are practical issues and hardships faced by numerous agencies, this is not, and cannot be, a basis upon which a criminal defendant's constitutional rights can be abrogated." Therefore, the court determined that "neither the failure to perform DNA analysis on the semen-positive oral swab prior to 2018, nor the fact that the instant case sat dormant until an unidentified person from the O.C.M.E. contacted the N.Y.P.D. about untested evidence, constitute[d] good cause for a delay in commencing the instant prosecution." The court also determined that "the People fail[ed] to raise any fact that could constitute good cause, during the time period in question, necessary to justify . . . this delay in prosecution."
Accordingly, the Supreme Court granted the defendant's motion to dismiss the indictment on the ground that there was an unreasonable delay in prosecution.
The People appeal.Analysis
"By statute and constitutional law, New York guarantees criminal defendants the right to a speedy trial and prompt prosecution" (People v Regan, 39 NY3d 459, 464; see NY Const, art I, § 6; CPL 30.20; People v Staley, 41 NY2d 789, 791). The Court of Appeals has "long held that 'unreasonable delay in prosecuting a defendant constitutes a denial of due process of law'" (People v Singer, 44 NY2d at 253, quoting People v Staley, 41 NY2d at 791). Thus, a deprivation of the defendant's right to a prompt prosecution may require dismissal of an indictment "'even though, in the interim, [the] defendant was not formally accused, restrained or incarcerated for the offense'" (People v Regan, 39 NY3d at 464-465, quoting People v Singer, 44 NY2d at 253; see People v Mattison, 162 AD3d 905, 906).
"The Court of Appeals has articulated the following factors to consider when determining whether a defendant's right to a speedy trial or due process right to prompt prosecution has been violated: (1) the extent of the delay, (2) the reason for the delay, (3) the nature of the underlying charge, (4) whether there has been an extended period of pretrial incarceration, and (5) whether there is any indication that the defense has been prejudiced by the delay" (hereinafter the Taranovich factors) (People v Mattison, 162 AD3d at 906; see People v Taranovich, 37 NY2d 442, 445). "The Taranovich framework is a holistic one" (People v Johnson, 39 NY3d 92, 96). Thus, "[n]o one factor or combination of the factors is necessarily decisive or determinative of the prompt prosecution claim, but rather the particular case must be considered in light of all the factors as they apply to it" (People v Regan, 39 NY3d at 465 [alterations and internal quotation marks omitted]; see People v Wiggins, 31 NY3d 1, 10). "Where, as here, there has been a protracted preindictment delay over a period of years, the burden is on the prosecution to establish good cause" (People v Innab, 182 AD3d 142, 145).
As to the first Taranovich factor, the preindictment delay of approximately 27 years was extraordinary, a fact that appears to weigh in favor of the defendant (see People v Decker, 13 NY3d 12, 15; People v Gardner, 204 AD3d 1039, 1041), although "a long delay may also work against the prosecution as the passage of time can make it more difficult for the People to meet their burden of proof" (People v Decker, 13 NY3d at 15). Additionally, although there is no statute of limitations for murder in the second degree, the crime charged herein, the Court of Appeals has consistently held that the absence of a statute of limitations "heightens the need for constitutional vigilance" (People v Regan, 39 NY3d at 467; see People v Singer, 44 NY2d at 253). However, "while the greater the delay, the more likely the harm to the defendant, there is no specific length of time that automatically results in a due process violation" (People v Johnson, 39 NY3d at 96-97). Importantly, courts have consistently declined to dismiss an indictment despite a lengthy delay [*4]between the crime and the filing of the indictment (see e.g. People v Decker, 13 NY3d 12 [15-year delay]; People v Vernace, 96 NY2d 886 [17-year delay]; People v Jolivert, 223 AD3d 573 [22-year delay]; People v Wald, 215 AD3d 497 [21-year delay]; People v Gardner, 204 AD3d 1039 [21-year delay]; People v Innab, 182 AD3d 142 [28-year delay]; People v Mattison, 162 AD3d 905 [31-year delay]; People v Hayes, 39 AD3d 1173 [16-year delay]; People v Pacheco, 38 AD3d 686 [18-year delay]; People v Atkinson, 85 Misc 3d 578 [Sup Ct, NY County] [nearly 30-year delay]; People v Krauseneck, 73 Misc 3d 1227[A], 2021 NY Slip Op 51137[U] [Sup Ct, Monroe County] [37-year delay]; People v Parrilla, 56 Misc 3d 766 [Sup Ct, Bronx County] [27-year delay]).
Concerning the second Taranovich factor, "a determination made in good faith to defer commencement of the prosecution for further investigation or for other sufficient reasons, will not deprive the defendant of due process of law even though the delay may cause some prejudice to the defense" (People v Rivera, 226 AD3d 929, 930-931 [internal quotation marks omitted]; see People v Lesiuk, 81 NY2d 485, 490). The People "necessarily have wider discretion to delay commencement of prosecution for good faith, legitimate reasons than they do to delay a defendant's trial after charges have been filed" (People v Regan, 39 NY3d at 465-466). Thus, the Court of Appeals has been "much more solicitous of the People when they offer even a colorable explanation for their delay," which might include the People's "need to investigate to discover the offender, to eliminate unfounded charges, and to gather sufficient evidence prior to the commencement of a prosecution" (id. at 469-470 [internal quotation marks omitted]).
Here, we agree with the Supreme Court's determination that, between 1992 and 2004, the People established good cause for the delay in commencing this criminal action against the defendant. The record from the Singer hearing indicated that, by the mid-1990s, the police had determined in good faith that they had exhausted all their leads. A case against the defendant would have been largely circumstantial, and the People thus had a good faith basis to wait until they uncovered additional evidence that more decisively implicated him (see People v Decker, 13 NY3d at 15; People v Innab, 182 AD3d at 145-146; People v Mattison, 162 AD3d at 906-907; People v Metellus, 157 AD3d 821, 822).
Contrary to the defendant's contention, this case is distinguishable from People v Regan. There, on August 9, 2009, the complainant reported to the police that she had been raped earlier that day, and identified the defendant as the perpetrator. On that same day, the police interviewed the defendant, who denied having sexual contact with the complainant and refused to provide a voluntary DNA sample, interviewed other witnesses, and administered the sexual abuse collection kit to the complainant. Four days later, the police collected a DNA sample from the complainant's boyfriend. Approximately eight months later, the police had determined that male DNA from someone other than the complainant's boyfriend was present in semen samples taken from the complainant's person and underwear. By April 6, 2010, approximately eight months after the incident, the People determined that they needed to obtain a DNA sample from the defendant. However, after the defendant failed to respond to additional requests from the police to provide a sample voluntarily, the People did not seek a court-ordered DNA sample from the defendant until November 2012. Notably, once the People submitted a warrant application, it was approved the same day it was submitted. The defendant's DNA was obtained three days later, and on February 4, 2013, the unidentified DNA from the now-38-month-old sexual assault came back consistent with the defendant's DNA, disproving his claim that he and the complainant did not have sex. In connection with this offense, the defendant was indicted on August 29, 2013.
Based upon these facts, the Court of Appeals determined that
"The People may not do what they did here. Although they should have immediately concluded, as the police did, that they would need defendant's DNA, they explicitly decided that they would need defendant's DNA by April of 2010. They then waited, for no asserted or apparent reason, and delayed seeking a warrant for that DNA until November of 2012. The People do not even argue that their delay represented a good-faith, strategic decision that was backed by sufficient reasons. Rather, they concede that the delay was due to incompetence and demand credit for the fact that they did not intend to sabotage defendant's defense" (People v Regan, 39 NY3d at 467-468 [emphasis added]).
Here, by contrast, the record from the Singer hearing revealed no eyewitnesses to Joyner's murder, no witnesses who could place the defendant on the roof at the time of the murder, and no latent fingerprints linking the defendant to the crime. Moreover, the police interviewed the defendant, who provided an explanation for his presence on the roof shortly before Joyner's death, as well as an explanation that placed him elsewhere at the time of the murder. The police also received information from other witnesses indicating that an individual who did not match the defendant's physical description confessed to the murder. Given these facts, contrary to the defendant's contention, it is not clear, on the record before us, that the People would have been able to obtain a court order to collect a sample of the defendant's blood for comparison to the semen sample recovered from Joyner's mouth (see Matter of Abe A., 56 NY2d 288, 291 ["a court order to obtain a blood sample of a suspect may issue provided the People establish (1) probable cause to believe the suspect has committed the crime, (2) a 'clear indication' that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable" (emphasis added)]). Instead, "[c]onsidering that the outcome of such a proceeding, under the particular facts of this case, would be very difficult to predict, we are loath to saddle the People with an affirmative duty to embark upon a course that could ultimately prove unsuccessful, and possibly jeopardize an ongoing investigation" (People v Innab, 182 AD3d at 146 [citations omitted]).
We also cannot say, without resorting to speculation, that the defendant would have provided a blood sample voluntarily in 1992. By contrast, the record indicates that when the People moved to compel the defendant to provide a buccal swab for DNA comparison in 2019, the defendant opposed the motion. Additionally, we cannot fault the People for not attempting to obtain an abandonment sample from the defendant. As O'Connor testified, in the 1990s, the OCME did not receive "a lot of abandonment samples," in part because the DNA testing protocols in effect before 1998 generally required a larger sample than that contained in most abandonment samples.
The defendant further contends that the People's failure to pursue "several additional leads," including comparing the shell casings to the gun recovered from Jermaine Graves, searching for "Mikey" in 1992, and the lack of any information in the record that the police investigated any connections between the defendant and Joyner, demonstrate that the initial investigation was lacking. Indeed, "neither ignorance nor indolence can be asserted to vitiate the constitutional guarantee of a prompt prosecution" (People v Regan, 39 NY3d at 467). Here, however, the record from the Singer hearing established that despite the police's efforts immediately following Joyner's murder, they were unable to uncover sufficient evidence to connect anyone to the homicide. Therefore, contrary to the defendant's contention, the delay here was not due to the "incompetence" of the police or the People (see id. at 467-468), but rather the People's apparent good faith determination to wait until they had uncovered additional evidence in connection with this case.
However, contrary to the conclusion reached by the Supreme Court, although the defendant's DNA profile appeared in CODIS by 2004, the police had already exhausted their leads by that time, and they had a good faith basis to wait until the OCME informed them that Joyner's swab was still available for DNA testing (see People v Mattison, 162 AD3d at 906-907; People v Metellus, 157 AD3d at 822). Here, the People primarily contend that the order appealed from "held the police to an unreasonable standard to investigate continually, in every case, even after they have exhausted all leads and the investigation has gone cold." The People highlight Dewhurst's testimony that "since 1992" to the time of the hearing, there were "[a]pproximately a little over 6000" cold case homicides in New York City, with approximately 12 to 14 NYPD cold case detectives working at the time of the hearing. Dewhurst testified that he had investigated anywhere between 13 and 17 cold cases at a time. However, as stated by the Court of Appeals in the context of a defendant's right to a speedy trial, "since the State initiates the action, it is the State's duty to see that the defendant is promptly brought to trial" (People v Johnson, 38 NY2d 271, 279). Thus, where the delay "was due to a shortage of personnel in the prosecutor's office, while not exactly a factor in the State's favor, must weigh less heavily than would most other causes" (id.). Similarly, in People v Jones (236 AD3d 1058), there was a 31-month delay between the death of the victim and the indictment. This Court, applying People v Johnson, determined that while "the People's explanation that the delay was attributable to a heavy workload and a staffing shortage in the District Attorney's Office as a result of the COVID-19 pandemic 'weigh[s] less heavily than would most other causes,' it is 'not exactly a factor in the [People's] favor'" (id. at 1059, quoting People v Johnson, 38 NY2d at 279). Here, too, the People's explanation that limited resources prevent the NYPD from continually investigating the thousands of cold case homicides, while providing some explanation for the delay, [*5]does not exactly weigh in their favor (see People v Johnson, 38 NY2d at 279; People v Jones, 236 AD3d at 1059; but see People v Atkinson, 85 Misc 3d at 585 ["law enforcement officials cannot be expected to reopen each and every cold case investigation simultaneously as soon as a new methodology for evidence gathering or mechanism for testing is invented or accredited. To do so would oversimplify law enforcement's alloc(a)tion of limited resources to investigate hundreds of cold cases and hold them to a standard that is, quite simply, impossible to achieve under the circumstances"]).
The People also contend that "[t]his Court, the Court of Appeals, and other appellate and trial-level courts have consistently upheld cold-case prosecutions without requiring a showing that the police could not have uncovered the new evidence significantly earlier." This position appears to have support in this Court's case law. For example, in People v Innab, this Court determined that "[w]hile the defendant correctly points out that DNA testing of the crime scene evidence could have been performed years earlier, there is nothing to suggest that such tests would have yielded any meaningful information, as the defendant's own DNA profile was not available to investigators for comparative purposes until it was entered into CODIS in March of 2008" (People v Innab, 182 AD3d at 145-146).
Similarly, in People v Mattison (162 AD3d at 905), "the decedent . . . was murdered in . . . 1980 during a robbery of his apartment. With no eyewitnesses and no match to latent fingerprints that were recovered from the crime scene, the investigation stalled." Then, in 2008, approximately 28 years later, "a detective with the New York City Police Department's Latent Print Unit randomly selected the case for fingerprint analysis, and determined that the defendant's fingerprints matched three fingerprints recovered from a jewelry box and two other boxes found in the decedent's bedroom" (id. [emphasis added]). Further investigation revealed that the defendant, who was a 17-year-old high school student at the time of the murder, was absent from school on the day of the murder. The defendant was ultimately arrested and indicted in 2012, "more than 31 years after the crime was committed" (id.). Considering these facts, this Court determined that the People had established good cause for the delay, noting that "a significant amount of the delay was due to a lack of evidence identifying a viable suspect," but noting that "[a]fter the defendant's fingerprints were matched to the fingerprints recovered from the three boxes in the decedent's bedroom, further investigation was conducted" (id. at 906).
This case is substantially similar to People v Mattison. Here, the police conducted an initial investigation that did not provide sufficient evidence to charge the defendant with Joyner's murder. Then, many years later, Dewhurst received a call from the OCME alerting the police to the existence of untested DNA evidence concerning Joyner's murder. Upon receiving this call, there does not appear to be any question that the police acted expeditiously in requesting DNA testing, reviewing the case file and reinterviewing witnesses, and ultimately arresting the defendant and seeking an indictment (see People v Decker, 13 NY3d at 15 [where decision to bring charges with essentially the same evidence discovered 15 years earlier, the Court of Appeals determined that "(t)he subsequent decision to bring charges, albeit many years later, was not an abuse of the significant amount of discretion that the People must of necessity have, and there is no indication that the decision was made in anything other than good faith"]). That the prosecution in this case was reinvigorated many years later by a seemingly random call to the Cold Case Squad is not determinative of whether the People demonstrated good cause for their delay in prosecution (see People v Vernace, 96 NY2d at 891 [Levine, J., dissenting] [majority declined to dismiss indictment for murder in the second degree despite a 17-year delay and despite the dissent's characterization that, "(i)n actuality, it was only by happenstance that the investigation of defendant's complicity in those murders was resurrected some 16 years after the event. In 1997, a detective on the Queens 'Cold Case Homicide Squad' was assigned the task of attempting to relocate Riccardi and arrest him pursuant to a then still outstanding homicide warrant. On his own initiative, and without any prompting from the District Attorney's office, he expanded his investigation to pursue leads on defendant"]).
Moreover, we note that since the OCME joined CODIS in 2000, courts appear loath to impose upon the People a requirement to seek prompt testing of cold case DNA evidence that existed pre-CODIS, let alone that the police or the People must reexamine cold case DNA evidence at any particular time (see People v Bradberry, 68 AD3d 1688, 1690 ["Here, although there is no question that there was a lengthy delay, we note that the reason for the delay was that the crimes were committed before the institution of CODIS and the police did not have a sample of defendant's [*6]DNA to which evidence from the crime could be compared until defendant was convicted of the subsequent crime of manslaughter, resulting in the entry of his DNA profile in CODIS"]; People v Parrilla, 56 Misc 3d at 769 ["Under these circumstances, if the court were to find fault in the NYPD for not requesting DNA testing on the clippings prior to 2015, in effect, it would be imposing upon the NYPD an unrealistic requirement to keep investigations open indefinitely"]).
Therefore, since the People demonstrated a good faith determination to defer prosecution of the defendant after the police exhausted their leads in the mid-1990s, the People established good cause for the delay in prosecution (see People v Innab, 182 AD3d at 146; People v Mattison, 162 AD3d at 905-907).
Considering the third Taranovich factor, the Court of Appeals recently stated that "the 'nature' of the underlying crime can refer to both its severity and, relatedly, the complexity and challenges of investigating the crime and gathering evidence" (People v Johnson, 39 NY3d at 97; see People v Regan, 39 NY3d at 470). Here, the crime charged, murder in the second degree, is "inarguably a very serious offense" (People v Decker, 13 NY3d at 15). Additionally, the investigation and evidence gathering in this case presented various challenges. Notably, there were no eyewitnesses to the crime, no witness could place the defendant on the roof at the time of the murder, and the police never recovered the murder weapon. As such, the People almost certainly would have needed to obtain a court order compelling the defendant to produce a DNA sample for analysis, an affirmative duty which, as discussed above, this Court is "loath to saddle the People with," especially where such a course "could ultimately prove unsuccessful, and possibly jeopardize an ongoing investigation" (People v Innab, 182 AD3d at 146; see Matter of Abe A., 56 NY2d at 291). Again, this case is distinguishable from People v Regan, in which "[t]he People had the complainant's sworn statement and witness interviews immediately; the only missing evidence was the DNA evidence from defendant, which could have been obtained with speed and ease" (People v Regan, 39 NY3d at 470 [emphasis added]). Thus, the third Taranovich factor weighs in favor of the People.
The fourth Taranovich factor also weighs in favor of the People, since the defendant was not incarcerated in connection with this offense until January 2019, when he was arrested and charged with Joyner's murder (see People v Decker, 13 NY3d at 15 ["defendant remained at liberty on the murder charge until after his indictment and, since he was not arrested during the initial investigation, was not subject to the anguish or public opprobrium often surrounding pending charges" (citation omitted)]; People v Gardner, 204 AD3d at 1041; People v Metellus, 157 AD3d at 823).
"As to the fifth [Taranovich] factor, prejudice caused by the delay," the Court of Appeals "ha[s] repeatedly held that if the first two [Taranovich] factors favor defendant, establishment of prejudice is not required to find a due process violation" (People v Regan, 39 NY3d at 471; see People v Singer, 44 NY2d at 254). Here, however, only the first Taranovich factor favors the defendant. With an extended period of delay, "it is likely that some degree of prejudice will result—given that memories fade, potentially making it more difficult for a defendant to establish an alibi or other defenses" (People v Decker, 13 NY3d at 15-16). However, "'impairment of one's defense is the most difficult form of [prompt prosecution] prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown'" (People v Wiggins, 31 NY3d at 18 [internal quotation marks omitted], quoting Doggett v United States, 505 US 647, 655). "Therefore, we 'generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify'" (People v Regan, 39 NY3d at 471, quoting People v Wiggins, 31 NY3d at 18).
Here, apart from this "presumptive prejudice" (People v Wiggins, 31 NY3d at 19), the defendant failed to establish special prejudice (see People v Regan, 39 NY3d at 471). It is true, as the defendant highlights, that of the three women who reported to the police in 1992 that a man with a physical description not matching that of the defendant confessed to shooting Joyner, by 2018 two of them had died, and the third had no recollection of the event when reinterviewed by Dewhurst. However, the People note that this potentially exculpatory evidence would likely be admissible at trial (see People v Deacon, 96 AD3d 965, 968; People v Gibian, 76 AD3d 583, 585). Moreover, the record from the Singer hearing did not establish the defendant's contention that some of the evidence collected from Joyner's autopsy, including fingernail scrapings, was no longer available for testing.
Therefore, upon consideration of the Taranovich factors, the extent of the delay in [*7]prosecution and the presumptive prejudice to the defendant is outweighed by the People's good cause for the delay, the nature of the crime, and the fact that the defendant was not incarcerated in connection with this charge prior to his arrest and indictment in 2019 (see People v Rivera, 226 AD3d at 931; People v Mattison, 162 AD3d at 906-907). Thus, the defendant's contention that he was deprived of his constitutional right to prompt prosecution is without merit, and the Supreme Court should have denied his motion to dismiss the indictment on the ground that there was an unreasonable delay in prosecution.
Accordingly, the order is reversed, on the law, the defendant's motion to dismiss the indictment on the ground that there was an unreasonable delay in prosecution is denied, the indictment is reinstated, and the matter is remitted to the Supreme Court, Kings County, for further proceedings on the indictment.
CHAMBERS, J.P., DOWLING and GOLDBERG VELAZQUEZ, JJ., concur.
ORDERED that the order is reversed, on the law, the defendant's motion to dismiss the indictment on the ground that there was an unreasonable delay in prosecution is denied, the indictment is reinstated, and the matter is remitted to the Supreme Court, Kings County, for further proceedings on the indictment.
ENTER:
Darrell M. Joseph
Clerk of the Court